NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| YVONNE MAXWELL, | |
| Plaintiff, | Civ. No. 19-8687 |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

THOMPSON, U.S.D.J.

## **INTRODUCTION**

This Social Security appeal comes before the Court to review, pursuant to 42 U.S.C. § 405(g), the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff Yvonne Maxwell's ("Plaintiff") application for disability insurance benefits under Title II of the Social Security Act ("Title II"), 42 U.S.C. § 401 *et seq.* Plaintiff seeks reversal or remand of the Commissioner's decision. (Pl.'s Br. at 10, ECF No. 10.) The Commissioner seeks affirmance of the decision. (Def.'s Br. at 1, ECF No. 26.) The Court has decided this matter based on the written submissions of the parties and without oral argument pursuant to Local Civil Rule 9.1(f). For the following reasons, the decision of the Commissioner is affirmed.

## **BACKGROUND**

### I.    **Procedural History**

On May 20, 2015, Plaintiff filed a Title II application for disability insurance benefits due to back problems, right leg problems, right foot problems, and breast cancer. (Admin. R. ("R.")

53.) Plaintiff alleges an onset date of disability beginning March 15, 2007, when Plaintiff was thirty-five years old, and a date last insured of December 31, 2013. (R. 53.) The claim was denied on August 15, 2015. (R. 53–62.) Plaintiff's request for reconsideration was denied on October 28, 2015. (R. 65–74.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (R. 87–88), which was held on December 18, 2017 (R. 15). On February 13, 2018, the ALJ issued a finding that Plaintiff was not disabled during the relevant time period. (R. 22.) On January 10, 2019, the Appeals Council denied Plaintiff's request for review. (R. 1.)

On March 18, 2019, Plaintiff commenced the present action, requesting judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) Plaintiff submitted a brief to the Court on August 2, 2019. (ECF No. 10.) The Commissioner submitted a responsive brief on November 15, 2019 (ECF No. 15), and Plaintiff filed a Reply on December 2, 2019 (ECF No. 16). Plaintiff's appeal is presently before the Court.

## II.     Medical Records

Prior to Plaintiff's alleged onset date of disability, Plaintiff worked as a human service assistant at Trenton Psychiatric Hospital. Outpatient hospital records from the Corporate Health Center indicate that Plaintiff sustained injuries on March 15, 2007 after she was pushed to the floor at work. (R. 278.) The Progress Note from Plaintiff's initial visit found a lumbar contusion, right knee contusion, and bilateral ankle sprain after ruling out fractures through X-rays. (R. 301, 324–26.) Plaintiff initially returned to work, but began having increased pain and, on April 10, 2007, returned to the Corporate Health Center, where the doctors ruled out deep vein thrombosis with testing and assessed a likely muscular strain. (R. 295–97, 306.) On April 13, 2007, doctors at the Corporate Health Center concluded that Plaintiff had a right leg sprain/strain and recommended that Plaintiff begin physical therapy. (R. 294.) Throughout Plaintiff's April 2007

2

visits to the Corporate Health Center, Plaintiff exhibited a minimal limp, but by May 2007, Plaintiff no longer exhibited a limp. (R. 292–94.)

On April 18, 2007, Richard Stoneking, P.T., P.A. at Orthopedic and Sports Physical Therapy examined Plaintiff and noted that Plaintiff could "ambulate without assistive devices other than the aforementioned knee brace" and found Plaintiff's injuries to be consistent with a knee contusion. (R. 305.) Mr. Stoneking recommended physical therapy three times a week for two weeks. (R. 305.) On May 2, 2007, however, Mr. Stoneking discharged Plaintiff from his care due to her repeated failure to attend therapy appointments. (R. 304.)

An MRI taken in May 2007 was normal, and Plaintiff returned to unrestricted duty. (R. 290.) A second MRI in October 2007 was also normal. (R. 474.) In November 2007, Plaintiff sought treatment from Dr. Adam Sackstein at the Pain Management Center and reported increased pain, which disturbed her sleep and was exacerbated by "[l]ying supine, walking, heat and stress." (R. 364.) Dr. Sackstein's report notes that an EMG[1] revealed an L5 radiculopathy,[2] but an MRI "was unrevealing." (R. 365.) Dr. Sackstein performed two lumbar epidural steroid injections to relieve the pain, but they were unsuccessful. (R. 364–66, 357–63.) In 2008, Plaintiff began seeing Dr. Maher Ibrahim, a pain management specialist, who performed two additional

---

[1] "Electromyography (EMG) measures muscle response or electrical activity in response to a nerve's stimulation of the muscle. The test is used to help detect neuromuscular abnormalities." *Electromyography (EMG)*, Johns Hopkins Medicine (last visited June 8, 2020), https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg.
[2] "Lumbar radiculopathy refers to disease involving the lumbar spinal nerve root. Lumbar radiculopathy may occur when the spinal nerve roots are irritated or compressed by one of many conditions, including lumbar disc herniation, spinal stenosis . . . or other degenerative disorders." *Lumbar Radiculopathy (Nerve Root Compression)*, Emory Healthcare (last visited June 8, 2020), https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html. Lumbar radiculopathy is also called Sciatica. *Id.*

epidural steroid injections, a right sacroiliac joint block, and right facet blocks, all of which only brought temporary relief. (R. 480–501.)

On April 24, 2008, Plaintiff returned to physical therapy at Orthopedic and Sports Physical Therapy. (R. 352) Plaintiff stated that an MRI had revealed an L5 herniated disk, and that she was taking Percocet and steroid injections for pain relief. (R. 352.) Plaintiff further reported that she "has been unable to bend over . . . go dancing and resume her usual activities" and that "there are days where she is able to do more activity painfree but th[is] usually results in increased pain the next 2-3 days." (R. 352.) Chad Durboraw, P.T., found that Plaintiff presented symptoms of chronic pain syndrome and recommended physical therapy three times a week for four weeks. (R. 353.) Plaintiff attended at least two sessions but then cancelled the remaining sessions. (R. 354.)

An MRI of Plaintiff's right knee taken on September 30, 2008 appeared normal. (R. 543.) In a follow-up visit on October 9, 2008, Dr. Ibrahim noted that Plaintiff "walks with a cane," but also noted that "there is no motor deficit." (R. 532.) On April 30, 2009, Plaintiff had an elective discogram, which showed that L5-S1 was the "primary pain generator" in her case. (R. 481.) However, Plaintiff also had a CT scan, which showed no evidence of a herniated disc or annular tear. (R. 481.) Dr. Ibrahim's physical examination also concluded that there was "no motor or sensory deficit," but that there was "tenderness over the lumbar spine." (R. 481.)

On November 9, 2009, Plaintiff was examined by Dr. Marc Levine, an orthopedic surgeon, who concluded that Plaintiff was not a surgical candidate based on the fact that a functional capacity evaluation filled out by Plaintiff on September 28, 2009 showed

"questionable patient reliability." (R. 461–62.)[3] On January 14, 2020, Plaintiff returned to Dr. Ibrahim, who concluded that Plaintiff had "reached maximum medical improvement" regarding her chronic back pain. (R. 467, 504.) Dr. Ibrahim later noted that Plaintiff could perform "sedentary work, lift up to 10 pounds, can do eight hour keyboarding and she can drive." (R. 469.) On March 29, 2010, Dr. Sackstein reported that, since Plaintiff's last visit in January 2008, Plaintiff had undergone a new EMG, which revealed S1 radiculopathy. (R. 356, 473.) Dr. Sackstein noted that he had nothing to offer Plaintiff from both "an interventional pain management standpoint" and a "curative pain management standpoint," and prescribed Plaintiff tramadol and Elavil as "palliative" treatments. (R. 356, 473.)

On March 25, 2010 and November 4, 2010, David Weiss, D.O., a Certified Independent Medical Examiner, submitted reports of Plaintiff's condition for the purpose of worker's compensation. (R. 437–58.) Plaintiff self-reported "difficulty with sitting and walking, each for more than 15 minutes . . . difficulty with standing for more than 10 minutes . . . "use[] [of] a cane for assistance on a daily and constant basis . . . [and] difficulty with repetitive bending, twisting and lifting of more than one-half pound." (R. 438.) Dr. Weiss diagnosed the following: (i) chronic post traumatic lumbosacral strain and sprain; (ii) discogenic disease of the lumbar spine L5-S1; and (iii) right lumbar radiculopathy. (R. 440.) Dr. Weiss reported that Plaintiff "ambulates with a markedly forward-flexed antalgic gait." (R. 441.) Regarding the right knee injury, Dr. Weiss also diagnosed (i) post-traumatic internal derangement to the right knee and (ii) post-traumatic patellofemoral arthralgia to the right knee. (R. 448.) Overall, Dr. Weiss found that

---

[3] Dr. Levine noted the following: "9/28/2009 Functional capacity evaluation has a reliability of poor with noted significant submaximal effort." (R. 461.)

Plaintiff's impairment "was estimated at 27 ½% to the right leg for the right knee" and "37 ½% of partial total for the lumbar spine." (R. 442.)

On December 15, 2010, Plaintiff had another MRI on her lumbar spine which showed no abnormalities. (R. 429.) On January 3, 2011, Dr. Peter Blumenthal, another Independent Medical Examiner, submitted a report finding that Plaintiff had "a 0% disability of the right leg" and a "permanent disability of 5%" of the back, concluding that Plaintiff could work without restrictions (R. 458.) Dr. Blumenthal noted that Plaintiff had "performed quite inconsistently" in her functional capacity evaluation, and also stated that Plaintiff "walks with a cane in her right hand and quite frankly, I do not see a true reason for the use of this cane." (R. 456.)

On January 23, 2012, Dr. Benotti at the St. Francis Medical Center performed an excisional biopsy of Plaintiff's left breast tissue due to suspicion of breast cancer. (R. 377–80.) Dr. Benotti then referred Plaintiff to oncology for genetic testing on February 7, 2012. (R. 368.) In a March 2, 2015 report, Dr. Blumenthal noted Plaintiff's breast cancer diagnosis and states that Plaintiff underwent a lumpectomy but refused the suggested chemotherapy and radiation. (R. 776.)

On March 6, 2012, Dr. Charles Kososky of St. Francis Medical Center performed electrodiagnostic studies on Plaintiff, which appeared normal (R. 761.) Dr. Kososky noted that the "etiology most likely is a demyelination affecting the S1 root, but I am not able to establish that the axon has been injured,"[4] and recommended repeat imaging of Plaintiff's lumbar spine (R. 762.) Upon a physical examination of Plaintiff's right leg, Dr. Kososky noted "no evidence

---

[4] "A demyelinating disease is any condition that results in damage to the protective covering (myelin sheath) that surrounds nerve fibers in your brain, optic nerves and spinal cord." *Demyelinating disease: What can you do about it?*, Mayo Clinic (last updated May 5, 2020), https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/expert-answers/demyelinating-disease/faq-20058521.

of atrophy," "normal strength," "no obvious sciatic notch tenderness," and very limited sensory deficit despite Plaintiff's claims of numbness. (R. 761.)

Records from St. Francis Medical Center indicate that Plaintiff again reported pain in her lower back and right knee in February and March of 2012, and an EMG was normal with "mild demyelination of S1." (R. 617, 621, 627.) Plaintiff was again assessed in August 2012 for chronic back pain, and a lidocaine patch was unsuccessful. (R. 627.) In a June 27, 2013 follow-up visit, Plaintiff reported that her back pain had been continuous for many months but was relieved with Mobic (meloxicam). (R. 630.) Plaintiff also complained of numbness in her right lower extremities and occasional difficulty controlling her urine. (R. 630.) A straight leg test was negative, but the doctor noted lumbar spine tenderness and referred Plaintiff to neurosurgery for epidural steroid injections. (R. 631.)

On June 3, 2014, Dr. Levine again examined Plaintiff and performed X-rays of her lumbar spine. (R. 410.) The X-rays showed no abnormalities, and Dr. Levine noted that a prior MRI showed "no evidence of neural impingent that would explain any type of radicular symptoms that [Plaintiff] describes today." (R. 410.) Dr. Levine also noted that Plaintiff had injections in her spine as recently as 2013 but no recent physical therapy. (R. 408.) Dr. Levine's examination revealed that Plaintiff had full and symmetric motor strength throughout the lower extremities, but the sitting straight leg test was positive in the right leg. (R. 409.) Dr. Levine found that Plaintiff was at "maximum medical improvement regarding the injury of 2007" and that nothing surgical could be done. (R. 410.) However, he opined that "there may be changes going on in either [Plaintiff's] lumbar spine or her right hip or pelvis that may or may not be related to her recent diagnosis of breast cancer from a metastatic standpoint that needs to be worked up outside the worker's compensation arena." (R. 410.)

On March 2, 2015, Dr. Blumenthal again assessed Plaintiff's impairments. After conducting a physical examination, Dr. Blumenthal reported only slight tenderness at the right sciatic notch; no issues with the muscles, the lumbosacral junction, and the sacroiliac joints; some hamstring tightness on the right straight leg raise; and normal heel and toe gait. (R. 776–77.) The report concluded that Plaintiff's condition had not worsened since Dr. Blumenthal's 2011 examination, and that she "would be capable of working as a human services assistant if she so desired." (R. 777–78.)

Dr. Weiss performed a third assessment of Plaintiff on May 19, 2015. (R. 789.) The report notes that Dr. Levine had diagnosed Plaintiff with low back pain and sciatica during his June 3, 2014 examination. (R. 786.) Dr. Weiss declined to make an impairment determination, and instead stated that additional studies were necessary. (R. 790.)

From July 2015 through June 2017, Plaintiff returned several times to St. Francis Medical Center, where she was prescribed Percocet and Ambien. (R. 827–43.) Plaintiff was referred to Dr. Kososky for another epidural injection. (R. 842.) Plaintiff also sought treatment at Revive Spine and Pain Center from February 2017 through June 2017. (R. 844–67.) Plaintiff reported that "[s]he was told to walk with a cane but does not like using a cane." (R. 865.) An EMG of the lower extremities performed on March 24, 2017 was normal. (R. 852.) As of April 14, 2017, Plaintiff reported that her pain was "much improved" while on pain medication, but a later exam noted that the "[p]ain has persisted for greater than 4 weeks and is functionally limiting the patient daily." (R. 848, 853.) Plaintiff repeatedly displayed a normal gait. (R. 846, 860, 863, 866.) On June 8, 2017, Plaintiff complained of recent onset right foot pain. (R. 847.) An MRI on June 22, 2017 showed "mild multilevel disc disease and degenerative change," while an X-ray of the right foot showed no abnormalities. (R. 868). On July 28, 2017, Plaintiff underwent a lumbar

8

medial branch block. (R. 872–74.) Plaintiff did not experience immediate pain relief but was instructed to follow up in ten days. (R. 874.)

On January 30, 2018, Plaintiff was assessed by Christine Hanna, P.A., at Revive Spine and Pain Center, who filled out a Medical Source Statement regarding Plaintiff's ability to work in an eight-hour workday. (R. 882–85.) Ms. Hanna reported that Plaintiff's significant side effects from her medication "can be expected to limit the effectiveness of work duties . . . for frequent (34% to 66% of an 8-hour workday) periods of time." (R. 883.) Ms. Hanna also reported that Plaintiff would need to lie down or recline for at least one and a half to two hours during the day on a daily basis, and that Plaintiff's symptoms would result in her being "off task" 25% or more in a typical workday. (R. 883–84.) Ms. Hanna also reported that that Plaintiff could only sit for less than two hours, stand/walk for up to one hour, lift ten pounds rarely, and walk one to two city blocks without rest. (R. 885.) When asked whether it is "reasonably necessary or recommended that your patient use a cane," Ms. Hanna responded, "Sometimes." (R. 885.)

**III.     Hearing Before the ALJ**

A.     *Plaintiff's Testimony*

At the hearing before the ALJ, Plaintiff testified that, on March 15, 2007, Plaintiff suffered injuries at work when she was thrown into a wall while attempting to break up a fight at work. (R. 37.) After the accident, Plaintiff was bedridden for three months and experienced constant pain in her lower back and legs. (R. 39–40.) Plaintiff was prescribed Percocet and muscle relaxers. (R. 40.) Plaintiff testified that she was still taking Percocet at the time of the hearing. (R. 41.) Plaintiff also testified that she needs to urinate fifteen times per day because the nerves in her back are on her bladder. (R. 42.) Due to the frequent urination and pain, Plaintiff

testified that she can only sleep about four hours a night and needs to nap several times throughout the day. (R. 46.)

As for motor functions, Plaintiff testified that she can only sit for about twenty minutes before she has to stand up, and that she can only stand for about fifteen or twenty minutes before she must sit down. (R. 44–45.) Plaintiff stated that she was prescribed a cane in 2007 or 2008, but she only uses the cane on days when her legs feel especially painful. (R. 45.) Plaintiff testified that she could at most lift a gallon of milk. (R. 46.) Plaintiff's son primarily does the housework, while Plaintiff occasionally grocery shops with the assistance of a scooter. (R. 46–47.) Plaintiff does not have a driver's license and says she cannot take public transportation due to her condition. (R. 47.)

      B.    *Vocational Expert Testimony*

The Vocational Expert ("VE") classified Plaintiff's prior work as a human service assistant to be a "semi-skilled" profession in the "medium exertional range." (R. 49.) Based on a hypothetical posed by the ALJ as to Plaintiff's physical abilities, the VE opined that Plaintiff would not be able to perform her past work (R. 49–50), but could perform several jobs in the "light exertion range" such as cashier II, information clerk, or storage rental facility clerk (R. 50). However, the VE said that these jobs would not be available if "the hypothetical individual would be off task 15 percent in an eight-hour workday and absent two days a month." (R. 51.)

## LEGAL STANDARD

**I.    Disability Determination by the Commissioner**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). To show disability, a claimant must "furnish[] such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." § 423(d)(5)(A).

The Commissioner employs a five-step sequential evaluation process for disability claims. *See generally* 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). The threshold inquiry in this process is (1) whether the claimant has engaged in any substantial gainful activity since her alleged disability onset date. § 404.1520(a)(4)(i). If not, the Commissioner considers (2) whether the claimant has any impairment or combination of impairments that is "severe," such that it limits the claimant's "physical or mental ability to do basic work activities." §§ 404.1520(b)–(c), 404.1521. If the claimant has a severe impairment, the Commissioner then examines the objective medical evidence to determine (3) whether the impairment matches or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. §§ 404.1520(d), 404.1525, 404.1526. If so, the claimant is eligible for disability benefits. § 404.1520(d). If not, (4) the Commissioner assesses the claimant's residual functional capacity ("RFC"), which is the claimant's remaining ability to work given her impairments. § 404.1520(e). Comparing the RFC with the requirements of past relevant work, the Commissioner determines whether the claimant has satisfied her burden of establishing that she is unable to return to her past relevant work. §§ 404.1520(f), 404.1560(b); *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007). If the claimant meets this burden, the burden shifts to the Commissioner to show (5) whether other work exists in significant numbers in the national economy that the claimant could perform given her medical impairments, age, education, past work experience, and RFC. § 404.1520(g); *Poulos*, 474 F.3d at 92. If such work does not exist, the claimant is deemed disabled. § 404.1520(g)(1).

## II.     District Court Standard of Review

Section 405(g) empowers district courts to "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, the court reviews questions of law *de novo* and questions of fact under a "substantial evidence" standard of review. *Id.*; *Poulos*, 474 F.3d at 91. "Substantial evidence is defined as 'more than a mere scintilla;' it means 'such relevant evidence as a reasonable mind might accept as adequate.'" *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer*, 186 F.3d at 427). Where the Commissioner's factual findings are supported by substantial evidence in the record, they are considered conclusive even though the Court might have decided the inquiry differently. § 405(g); *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). However, the Commissioner must "analyze[] all evidence and . . . sufficiently explain[] the weight he has given to obviously probative exhibits." *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (internal quotations omitted); *accord Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000).

## DISCUSSION

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability of March 15, 2007. (R. 17.) At Step Two, the ALJ found that Plaintiff's right L5 radiculopathy was a severe impairment. (R. 18.) At Step Three, the ALJ found that Plaintiff's impairment did not meet or medically equal the criteria of any of the listed impairments. (R. 18.) At Step Four, the ALJ concluded that:

> [Plaintiff] has the [RFC] to perform a range of light work as defined in 20 CFR 404.1567(b). Specifically, she can lift and carry 20 pounds occasionally and 10 pounds frequently; sit for 6 hours; stand and walk for 4 hours; and push/pull as much as she can lift/carry. She can operate foot controls with her left foot occasionally. She can climb ramps and stairs occasionally; climb ladders, ropes, or scaffolds occasionally; balance occasionally; stoop occasionally; kneel

occasionally; crouch occasionally; and crawl occasionally. She can work at unprotected heights occasionally, in humidity and wetness occasionally, in dust, odors, fumes and pulmonary irritants occasionally, in extreme cold occasionally, in extreme heat occasionally.

(R. 18.) Although the ALJ found that Plaintiff could not perform any past relevant work, the ALJ determined that Plaintiff could perform jobs such as cashier II, information clerk, and storage rental facility clerk. (R. 21–22.)

In reaching this determination, the ALJ primarily relied on outpatient records from the Corporate Health Center, physical therapy records from Orthopedic and Sports Medicine, outpatient records from the Pain Management Center, progress notes from May 2009 through June 2014, and the 2015 report from Dr. Blumenthal insofar as it refers to a 2013 assessment by Dr. Levine. (R. 20.) The ALJ also acknowledged Plaintiff's Function Report, which Plaintiff submitted on June 12, 2015. (R. 212–23.)[5] However, the ALJ stated that "little weight is afforded to [the Function Report] as it is not impartial and was prepared 1.5 years after the claimant's date last insured." (R. 20.) Similarly, the ALJ afforded little weight to the opinions prepared for worker's compensation in Exhibits 5F, 9F, and 11F because "worker's compensation is a different program from Social Security and has different requirements." (R. 20.) Based on the above, the ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 20.)

Plaintiff argues that the ALJ erred in the following ways: (i) "failing to evaluate the treating source opinion of Christine Hanna," (ii) failing to address Exhibits 12F–20F altogether,

---

[5] In Plaintiff's Function Report, Plaintiff stated that she can walk ten to fifteen minutes before needing to rest for thirty minutes and can pay attention for one to one and a half hours. (R. 217.) Plaintiff also reported that her condition affects lifting, walking, sitting, squatting, stair climbing, and using hands. (R. 216.)

(iii) failing to address Plaintiff's need to use a cane, and (iv) failing to consider the worker's compensation opinions. (Pl.'s Br. at 1–2, ECF No. 10.) The Court will consider each of these arguments in turn.

## I.        Christine Hanna Opinion

Plaintiff first asserts that the ALJ erred by failing to address the report by Christine Hanna, P.A. ("Hanna Report"), which was submitted to the ALJ on February 2, 2018 after the hearing but prior to the ALJ's decision. (Pl.'s Br. at 12.)[6] Hanna assessed Plaintiff's physical impairments as of January 30, 2018 and found that Plaintiff could only sit for less than two hours, stand/walk for up to one hour, lift ten pounds rarely, and walk one to two city blocks without rest. (R. 885.) Hanna's assessment also found that Plaintiff's symptoms would cause her to be off task 25% or more of an eight-hour workday. (R. 884.) These findings run contrary to the ALJ's RFC determination (*see* R. 18), and the ALJ did not reference the Hanna Report in his decision. Plaintiff argues that this omission warrants reversal because, under *Burnett*, an ALJ is required to provide an explicit rationale for rejecting probative evidence. (Pl.'s Br. at 12–13.) *Burnett*, 220 F.3d at 121 ("In making a [RFC] determination, the ALJ must consider all evidence before him . . . In the absence of such evidence, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."); *see also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions . . . .").

---

[6] Despite being submitted after the hearing, the ALJ admitted the opinion into the record as Exhibit 21F. (R. 27.)

Defendant responds that the Hanna Report was not probative—and therefore the ALJ did not have to consider it—because the report "did not relate back to the relevant time period" and was from a "non-medical source." (Def.'s Br. at 7.) However, as Plaintiff correctly notes, a licensed Physician Assistant is considered a medical source under Social Security Administration Regulations, 20 C.F.R. § 404.1502(a)(8). (Reply at 4, ECF No. 16.)[7] Also, non-contemporaneous evidence can be probative in certain circumstances. *See Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) ("Retrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated by lay evidence relating back to the claimed period of disability, can support a finding of past impairment."). In *Newell*, the Third Circuit reversed and remanded because the ALJ had failed to consider the plaintiff's non-contemporaneous evidence that suggested an earlier onset date of disability, recognizing that the plaintiff suffered from "slowly progressing conditions." *Id.* at 547–49.

However, the circumstances at hand are distinguishable from those in *Newell*. In *Newell*, the plaintiff lacked records from the relevant time period because she could not afford to seek medical treatment, and therefore the court found medical records from a year after the date last insured to be probative. *Id.* Here, Plaintiff did seek treatment throughout the relevant time period and submitted lengthy medical records, which were considered in the ALJ's decision. *See Mauriello v. Astrue*, 2010 WL 2079717, at *11 (D.N.J. May 25, 2010) (distinguishing the plaintiff's case from *Newell* because "the ALJ ha[d] access to adequate medical records from the time period in question"). Additionally, nothing in the Hanna Report refers back to the relevant time period or discusses the origin of Plaintiff's impairments. Instead, the Hanna Report assesses Plaintiff's physical capabilities as of January 30, 2018, over four years after the date last insured.

---

[7] The page number to which the Court refers is the CM/ECF page number.

(R. 882–85.) For these reasons, the Court finds that the Hanna Report has little probative value, and therefore the ALJ did not err by refusing to address it. *See Fargnoli*, 247 F.3d at 42 (requiring the ALJ to consider conflicting *probative* evidence); *see also Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (remanding where the ALJ failed to provide an explanation for rejecting "probative evidence which would suggest a contrary disposition").

Additionally, the Court finds that the ALJ's determination is supported by substantial evidence in the record. Medical records show that Plaintiff suffered from lumbar radiculopathy throughout the relevant time period, but there are inconsistencies as to the severity and limiting effects of Plaintiff's condition. Additionally, multiple sources note the inconsistencies in Plaintiff's own reported pain and her physical abilities. (*See, e.g.*, R. 461 (finding "questionable patient reliability"); 481 (finding "no motor or sensory deficit" but tenderness over the lumbar spine); 761 (finding normal strength in the lower extremities, no sciatic notch tenderness, and limited sensory deficit).) Accordingly, because substantial evidence in the record supports the ALJ's findings, and because the Hanna Report has little probative value, the Court finds that the ALJ did not err in omitting the Hanna Report from his analysis.

## II.     Failure to Consider Exhibits 12F–20F

Plaintiff further argues that the ALJ erred by failing to address Exhibits 12F–20F altogether. (Pl.'s Br. at 12.) These exhibits, with the exception of Exhibit 12F, contain records from after Plaintiff's date last insured. Plaintiff does not pinpoint what evidence in these records constitutes "conflicting probative evidence." *Fargnoli*, 247 F.3d at 42. Exhibit 12F documents Plaintiff's several visits to the Henry J. Austin Health Center from December 13, 2010 through June 16, 2011, during which Plaintiff was prescribed refills of her pain medication and doctors found that Plaintiff likely suffered from lumbar radiculopathy. (R. 806–13.) This information is

consistent with the ALJ's findings, and therefore does not constitute conflicting probative evidence.

Upon review of the remaining non-contemporaneous exhibits, the Court finds that the information contained therein is not particularly probative. The exhibits document Plaintiff's continued pain after the date last insured, as well as some newly developed conditions. (*See, e.g.*, R. 827–42 (documenting continued prescriptions of pain medication); 842 (noting that a new EMG appeared normal); R. 847 (citing Plaintiff's complaint of newly developed foot pain).) This information is primarily cumulative with the other exhibits cited by the ALJ. The only significant finding in these exhibits was an MRI on June 22, 2017 that showed "mild multilevel disc disease and degenerative change." (R. 868.) However, as noted above, the existence of ample medical evidence from the relevant time period diminishes the probative value of non-contemporaneous exhibits. *See supra* Section I. Plaintiff underwent numerous MRIs during the relevant time period that all appeared normal (R. 290, 474, 543, 429.) Accordingly, these results hold greater weight than the results of the MRI taken several years after Plaintiff's date last insured. For these reasons, the ALJ did not err by omitting Exhibits 12F–20F from his opinion.

### III.    Use of a Cane

Plaintiff also asserts that the ALJ erred by failing to address Plaintiff's need to use a cane and failing to pose a hypothetical that included the use of a cane to the vocational expert. (Pl.'s Br. at 15.) Plaintiff contends that none of the vocations identified by the VE could be performed with the use of a cane. (*Id.* at 16.) Defendant responds that the ALJ noted Plaintiff's use of a cane and nothing in the record suggests that the cane was medically necessary. (Opp'n at 8.)

In addressing a claimant's RFC, the ALJ need only consider "medically required" devices. SSR 96–9p, 1996 WL 374185, at *7 (July 2, 1996). "To find that a hand-held assistive

device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." *Id.* A prescription for a cane is insufficient to demonstrate that a cane is medically necessary. *See Howze v. Barnhart*, 53 F. App'x. 218, 222 (3d Cir. 2002) (finding that multiple references to Plaintiff's use of a cane throughout the record and a physician's "script" for a cane were "insufficient to support a finding that the [plaintiff's] cane was medically necessary"); *see also Rodriguez v. Comm'r of Soc. Sec.*, 2017 WL 935442, at *8 (D.N.J. Mar. 9, 2017) (finding the plaintiff's cane was not medically necessary, despite a prescription for the cane, because the plaintiff admitted he could walk several blocks without the cane and other medical reports indicated that the claimant's gait was normal).

     Plaintiff has not provided sufficient evidence that her cane was medically necessary. The ALJ acknowledged that Plaintiff reported using a cane in her Function Report and testified that she was prescribed the cane in 2007 or 2008. (R. 19.) However, there is no evidence of this prescription in the record. While several medical professionals observed that Plaintiff walked with a cane, none made a medical determination that the cane was required, and several reports indicated that Plaintiff exhibited a normal gait. (*See, e.g.*, R. 509 ("Gait and station were normal."); R. 532 ("[Plaintiff] walks with a cane. There is no motor deficit.").) Additionally, at least one medical opinion found that Plaintiff did not require the use of a cane (R. 456 ("[Plaintiff] walks with a cane in her right hand and quite frankly, I do not see a true reason for the use of this cane.")), and Plaintiff herself testified that she only uses the cane on days when her pain is greater than usual (R. 45). For these reasons, the ALJ's decision not to include Plaintiff's use of a cane in the RFC determination is supported by substantial evidence.

IV.     **Worker's Compensation Opinions**

Finally, Plaintiff argues that the ALJ erred by "wholly reject[ing] the Plaintiff's substantial Workers' Compensation opinions." (Pl.'s Br. at 16.) Plaintiff contends that "while it is true that an ALJ may accept some parts of the evidence and reject other parts, she must, however, consider all the evidence and give some reason for discounting the rejected evidence." (Pl.'s Br. at 17 (citing *Adorno*, 40 F.3d at 48).) Meanwhile, Defendant asserts that the ALJ is permitted to give lesser weight to opinions prepared for worker's compensation. (Opp'n at 6.)

In *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984), the Third Circuit noted that "there are different statutory tests for disability under worker's compensation statutes and under the Social Security Act," and therefore an ALJ "could reasonably disregard so much of the physicians' reports as set forth their conclusions as to [the claimant's] disability for worker's compensation purposes." *Id.* at 247–48. However, the Court recognized that this does not apply to objective medical findings within those reports. *Id.* Relying on *Coria*, the Third Circuit more recently upheld an ALJ's decision to afford little weight to the opinions in a report prepared for worker's compensation, even though the ALJ was silent as to whether he considered the medical findings in the report. *See Moraes v. Comm'r of Soc. Sec.*, 645 F. App'x 182, 186–87 (3d Cir. 2016). The Court reasoned that although the ALJ did not "expressly cite the portion of [the] report that discusses her findings as to [the plaintiff's] medical conditions, there is no indication in the decision that the ALJ wholly rejected those findings; indeed, they are consistent with the ALJ's determination at step two." *Id.* The Court reasoned that the findings in the report had little additional probative value, and therefore the ALJ was not required to reference them. *Id.* (citing *Fargnoli*, 247 F.3d at 42) ("[W]e do not expect the ALJ to make reference to every relevant treatment note.").

19

The ALJ did not wholly reject the worker's compensation exhibits as Plaintiff suggests, but rather stated that "the *opinions* in Exhibits 5F, 9F, and 11F have been considered but are not afforded much weight." (R. 20 (emphasis added).) The ALJ cites to several medical findings contained in Exhibits 5F and 9F, including MRIs performed in October 2007 and December 2010 and Dr. Levine's findings as noted in Dr. Blumenthal's report. (R. 20.) Therefore, similar to *Moraes*, there is no indication that the ALJ wholly rejected the medical findings in these reports, and the findings are consistent with the ALJ's determination that Plaintiff suffered a severe impairment of right L5 radiculopathy. The ALJ based his decision to give little weight to the opinions on the fact that "worker's compensation is a different program from Social Security and has different requirements." (R. 20.) This reasoning is consistent with the Third Circuit's holding in *Coria* and provides a sufficient explanation for affording these opinions little weight. For these reasons, the ALJ did not err in his decision to give little weight to the opinions prepared for worker's compensation.

## CONCLUSION

For the foregoing reasons, the Court affirms the decision of Defendant Commissioner of Social Security. An appropriate Order will follow.

Date: June 10, 2020

ANNE E. THOMPSON, U.S.D.J.